Thank you, Your Honor. May it please the Court, my name is Stephanie Adraptis and I represent the appellant John Russell. Russell was convicted of first-degree murder based on DNA evidence. His due process right to a fundamentally fair trial was violated when the trial court failed in its gatekeeping function by admitting novel and unreliable scientific evidence without conducting a full and fair pretrial admissibility hearing. The trial court also unfairly hamstrung Russell's defense by suppressing most of the evidence pointing to another man as the killer. That ruling violated the bedrock due process right to present a full and complete defensive trial. Unlike single-donor DNA cases, Russell was one of at least three donors to the vaginal swab sample in this case. The prosecution's argument that Russell could be singled out as the perpetrator was a second DNA analysis claiming that Russell's sample was not present on the victim's underwear. That second analysis performed by Sorensen Laboratory was unreliable because they took 33-year-old samples, some of which had not even been refrigerated, and failed to use a standard control, a stochastic threshold designed to alert the analyst that some genetic material had dropped out or failed to appear on the diagram. Because the analytical methods used in this case were novel, and because they were materially different from those approved in other cases, Russell should have had an opportunity to challenge the admissibility of that testimony in a pretrial hearing. But didn't he have his own expert that countered the state's expert? He did, Your Honor. However, the testimony that was given at the trial was not of the type that a jury could reasonably parse and understand the reasons why this evidence was unreliable. For example, the state's expert testified that the loci that we amplified that were deemed suitable, we viewed those as reliable and used those for our analysis. That those statements were so couched in scientific jargon that are beyond the ability of most jurors and even most lawyers to truly understand without substantial background education, made the trial fundamentally unfair. This is the kind of evidence that should have been either excluded entirely because it was unreliable on its face, or the judge should have put some guardrails or limitations upon the certainty with which the analyst was able to express her opinions. Because we're under AEDPA, what's the clearly established federal law that you would point to? Your Honor, I cited two clearly established U.S. Supreme Court cases that establish the fundamental right to a fair trial. And I will concede that those cases which are cited in the brief concern things like eyewitness identification or other kinds of evidence that are not DNA evidence. However, the court does not need a case that is based on the same kind of fact pattern to apply a fundamental constitutional principle. That is only one prong of the AEDPA Subdivision D-1 test. We don't need to have materially similar facts. We just have to have a violation of a fundamental constitutional right that's clearly established. But here, the fundamental right to a fair trial and the presentation of evidence, which this court recognized in Jimenez v. Ochoa as applying to scientific evidence, was violated here. On the fact that it's a little bit more on the cutting edge, this isn't a case where it's complete junk science and everyone admits it. This here, the technique they use is, you know, maybe there's some dispute among some people. But this is, you know, it seems like this is a unique fact situation such that you can't rely on broader cases that you cite. Well, Your Honor, what happens here in a nutshell was that they took PCR processes, which is basically taking a very tiny amount of sample and amplifying it, making it considerably more, and they used it in a way that didn't employ standard controls. And what was particularly crucial in this case is that they were presenting this evidence to claim that there was an exclusion, not an inclusion. Usually with DNA, we're dealing with an inclusion where they're saying this is identified as the person. In this case, they were saying he wasn't present, that his sample was not there, a fundamentally different scientific question than an inclusion. And the fundamental flaw here is that when you want to be able, as a scientist, to say that data was not present on the DNA diagram, you must have a threshold for determining whether the signal strength was strong enough that you can say with any scientific certainty that data is not missing. And that is a very hard concept for a juror to grasp. It's a very hard concept for most people to wrap their minds around. And the jury could not have fundamentally understood that problem. It was one that scientists still now are debating when they're dealing with samples like this that are very old, that are very degraded, and that are a mix of a number of people. And we have here a situation that's simply not addressed in the other cases that we've seen. Lazarus and the other state court cases were not dealing with a 33-year-old unrefrigerated sample where the state was trying to tell the jury, hey, we didn't find this guy's sample when we did this test, so it's not there. That's the second part that is the really misleading part of the testimony here. Certainly one could say we did our best, we used the best technique that we could, and we didn't find it. That would be truthful. However, to tell the jury it was never there to begin with, and that's what the prosecutor argued to these jurors. It wasn't there. She said that repeatedly. We tested it, and he just wasn't there, so he must be guilty. Well, if you really break down what they did in this case, they washed the sample to get rid of the degraded parts. Well, that could have been Mr. Russell's sample that got washed away. They admitted at trial they did that. We washed it. Then they said we ran two different tests, one which used the control, the stochastic threshold, and we used a standard five-second injection, and it was uninterpretable. You know, I actually want to go for a second, if we could, to your second argument, which is that there is evidence that was disallowed by the state court judge, specifically the information about Mr. Carrillo. Could you tell me what the standard which the state court should have viewed this evidence and what the error was? Your Honor, the problem with the court of appeals analysis, the state court of appeals, is that they use an abuse of discretion standard, which is under state law what applies when you're applying a state court evidentiary rule. But Mr. Russell's lawyer very clearly raised the due process issue, the federal constitutional issue, as to exclusion of evidence, and the state court of appeals just ignored that. They should have applied a de novo standard of review under the due process clause and didn't. And my argument is, and this is clearly under Panetti, the U.S. Supreme Court case, that this court, on review, should now apply a de novo standard, given the state court's failure to apply the correct standard in its court of appeal decision. Go ahead. How do you address the fact that the state court did, in a footnote, just say, you know, we reject this? Didn't they say we reject this under an abuse of discretion standard? Your Honor, as I argued in the brief, it's just a passing reference. It doesn't acknowledge that it's a completely separate constitutional standard and a de novo standard, since they never addressed how they would have dealt with it de novo, and instead just said, well, he didn't abuse his discretion, one of the easiest tests to pass, frankly, you know, on appeals. I think that might be because the argument was couched in the state court more in state law terms. Understood, Your Honor, that it was presented in state law terms, but the counsel clearly, and I included those pages in my supplemental excerpts, he clearly raised the due process issue as a separate issue. And because of that, the court of appeals should have addressed it under both standards, should have acknowledged that under a de novo standard, you're looking at a different situation. One more at this point. Are you, on this part of your argument, this part of the claim, are you arguing there was an unreasonable application of the law or an unreasonable determination of the facts, or is it both? It's both, Your Honor. I think for several reasons. One is, for example, under the unreasonable determination of facts under D2, I mean, the court said there just wasn't a sufficient nexus between Carrillo and this incident, when clearly there was. They just ignored the evidence that pointed to him, the evidence that he was with the victim. Can you specify what that is? I'm sorry? Can you specify that evidence? What evidence was it that the judge missed? Well, the defense counsel did present the evidence. It's in my excerpts of record. There's not only his written pleading, but also the oral argument that he presented on this prior to trial. But the evidence was that Carrillo was having an extramarital affair with the victim. He had threatened the victim's life in a written note. He was with the victim on the night of the incident. She had checked into a hotel room with him, and her car had been left at the hotel. She also saw him that night and in front of witnesses, had an argument during which he dropped a gun of the same caliber that was used to kill her. He lied to the police when they questioned him about his whereabouts and about his relationship with the victim. And under California law, lying about such things is generally considered to reflect a consciousness of guilt. So all of that evidence tends to point to him as the killer. There's also the observations by the unbiased witness who saw the victim get into her car and then abruptly stop in the intersection as though somebody was in the car. And given the tight timeline here where she was killed very shortly after she left the bar, it does suggest that the killer was hiding in the car. Who would have known which car was hers? Sebastian Carrillo because he had a preexisting relationship with her. In the oral argument, defense counsel also pointed out that there was evidence that Carrillo did not himself own a car. Whoever killed the victim used her vehicle to do it, and that's an unusual fact situation and one that the jury should have been allowed to consider here. Is there anything in the record about whether a DNA test was done with respect to Carrillo? There is not. I was not able to find anything in the record that was available on appeal. Unless Carrillo died in Mexico somewhere. Yes, there was information that that's what happened. He went back to Mexico and passed away. Unless the court has further questions, I'd like to reserve three minutes of my time. Great. Thank you. Good morning, Your Honor. Deputy Attorney General Louis Carlin, former respondent. May it please the court. Let me start quickly with the third-party culpability and go to the ruling in state court. It actually was a very clear and intelligent ruling. What happened there is that under California law, consistent with Holmes, the U.S. Supreme Court case that is the clearly established law, there was a due process violation when third-party evidence is excluded entirely based on an arbitrary rule. Holmes made clear that when you have a rule that is based on a determination that the connection between the third party and the crime itself is too tenuous, it does not come in. You need evidence connecting the person to the crime sufficient to raise a reasonable doubt. You just list out a litany of reasons why it wouldn't be too tenuous, and I think her argument would be that it was the judge's misapplication of those facts, right? That was the argument, Your Honor. The reason it doesn't work is that the evidence that actually would connect Carrillo to the crime was absolutely inadmissible, and under California law, the evidence has to be admissible for third-party culpability evidence. Some of this evidence seemed to come in, though, right? I mean, there were some pieces of this that were actually part of the trial, like a dispute with a man with his son at the cafe. Yeah, if I may try to break those two apart, because you want to see what comes in and what was kept out. So what came in was the altercation at the bar, the verbal altercation with a person who looked like Carrillo. That came in through Ms. Oregon's testimony. And did that include the fact that this person had a gun? It included the fact that the gun fell out of the pants and he replaced it. What didn't come in is what would have connected Carrillo to the crime. And wasn't she shot with a small caliber gun? Let me go right to the gun, Your Honor. The evidence was that the gun fell out. The evidence that was excluded would have come from a person named Jaime Galvez, I believe. He never testified. So the source of this information is a preliminary hearing where the Detective Rodriguez, in conforming with California law, was recapitulating hearsay. He was asked about a witness statement from this witness. And the statement was, I saw a revolver fall out of him, fall out. I saw a low caliber .22 or .25 caliber revolver. And I actually died. He did. But the reason it is irrelevant, entirely and unsupported, is that Ms. Zuniga was killed by a semi-automatic, not a revolver. There were expended bullet casings at the scene. That would not happen with a revolver. Did she also have the gun, the ring that belonged to Mr. Carrillo? Right, so again, the gun does not tie Mr. Carrillo to the killing in any way. It was not a revolver. As to the ring, yes, there could have been testimony that the victim was wearing a ring in the unburied portion of her body in the shallow grave. But if it had been Carrillo, that's not evidence committing him to a murder. Why would he leave the ring on? Why would he leave a calling card? The evidence was that he had a congenial relationship with Ms. Zuniga, not that he had any reason to kill her. And as to the many errors criminals make as they're committing crimes, don't you think that that could possibly have been a reason? It could possibly be the reason. But again, that's not evidence that he committed the crime. Again, so what... Wait, when I ask, that's not even the question. The question is, is this an unreasonable application of clearly established federal law or an unreasonable determination of the facts? That's absolutely correct, Your Honor. But I do want to make clear that the evidence that was excluded was not good evidence that would not have come in under any trial. The note, so yes, had there been a threat, that would have connected him. What was that evidence? That was evidence from Pauline Smith, who was Carrillo's wife at the time. She said, this was testimony in a pretrial deposition. She said, I found a note lying on the floor of our bedroom. It was in Spanish. I couldn't read it. I had a neighbor translate it for me. She told me that what it said, it did not mention any addressee. I understand the note issue, but was the exclusion of the fact that she was staying in his hotel room excluded? Yes. Okay. And why was that? Why do you think that that was appropriate to exclude that? Because a consensual sexual relation with her before the incident doesn't connect him to the crime. On the night of her murder? On the night of her murder. Okay. She's a prostitute. That has no bearing on whether he was killed, whether she was killed brutally hours later. And to tie that back to the DNA. He lied about it that night of, or the day of her murder? He did lie about that. Okay. He lied about it, got her ring. He dropped it on the night of. She's restored at his house, at his hotel room, and it was proper to exclude. Absolutely. That does not connect, that does not raise a reasonable doubt as to whether he committed this brutal crime. Okay. And to go back, the key is not that, the key evidence was not whether the DNA was on or was not on the underwear or the pants. The key is that there was no drainage of the DNA from her body. The vaginal swabs, he had two portions. Epithelial connected only two people, the victim and Mr. Russell. Epithelial cells are very, are non-robust, and only his was there. Yes, the more sensitive DNA testing showed the presence of at least two other people. But the overwhelming amount, the primary contributor by a long ways, and this is absolutely in the record, is Mr. Russell. So, had Mr. Russell engaged in consensual intercourse earlier in the evening, perhaps when Ms. Oregon said that she took a break and left, I want to say two just to back up, that testimony wasn't inconclusive. She said... Counsel, he doesn't have to have sex with her before he kills her. He doesn't, but there is overwhelming evidence at the scene of the crime that this was a rape. So, had it been consensual and she'd come, you know, it would have been earlier in the evening, got up out of bed, dressed, gone to the Army, Navy, Captain... Your point is that that would exclude him as the killer, that's not the point. The point is whether or not he should have been allowed to have that evidence presented to the jury so that the jury could determine whether or not it's possible that he could have been the suspect, correct? Correct. Under California law, consistent with Holmes, you have to have enough evidence to raise a reasonable doubt that this third party was, in fact, the killer. So, there was not that here. There is no nexus. Again, the threatening note is not admissible and is not reliable. The gun is not the same gun. It was not a revolver. Unless he stood there and emptied out the casings at the scene at the shallow grave, that makes no sense. Yes, she engaged in prostitution. They had a relationship. That does not mean, and that has no bearing on whether he was the killer under these circumstances. That was a reasonable ruling. And as the court has pointed out, the question is, is this a violation of clearly established federal law? The case is Holmes. This isn't even close to Holmes. And then I guess even if it were, we'd still have to answer the Brecht question on the third party culpability issues because at that point we would still have to say it was actual and injurious to the verdict. Yeah, this is not strong evidence of third party culpability. Could a trial judge have decided to keep it in? Yes. Could a trial judge have reasonably kept it out? Yes. And, again, that is an unreviewable question of state law. That's clear. That is an unreviewable state law issue. The question is the Holmes question. And this, again, is not Holmes, as the court has pointed out. Evidence did come in. In fact, on the gun, better than when the actual evidence that's supposedly so good had come in because they would have said, look, this guy saw a revolver. Some of the Supreme Court cases are the older ones that led to this line of authority or cases where the state rule was problematic because the rule on its face was excluding too much evidence. Here the Supreme Court has basically indicated the California rule on its face is fine. We're talking about an arguable misapplication of that rule. Are you aware of any cases where a court has said it's an unreasonable application of clearly established federal law where we're talking about a state evidentiary rule that's presumptively valid like the one we have here? No. This court itself has said that there is no example of a Supreme Court decision finding anything like that. So we would come to the analogy that my colleague has talked about. I think that's as close as you get. The unreasonable lineup, suggestive lineups, I think that would be as close as you get. But no, the Supreme Court has never done so. On the argument about whether the DNA evidence was so esoteric, it really wasn't. You had a pretty clear dispute and you had defense expert Mr. Taylor explaining why you can never do an analysis if you don't satisfy the stochastic threshold. Explained what it was, having enough material to make a valid test. The Buchanan, the expert at the hearing, whether they were going to have a Kelly Fry, explained exactly why this method, the capillary electrophoresis analysis, is exactly what you use when you don't have that. And that's the entire point of it. That by doing the 10-second viewing and then repeating it, that's the way you find out whether there's allele drop-in or drop-out. And the expert who testified at trial for the prosecution, Ms. Jeske, explained when you're doing that 10-second visualization, you can see in real time whether there's allele drop-in or drop-out. Has this method ever been excluded to your knowledge? No. In fact, in the Henderson case that both sides pointed out and we relied on, the court specifically found that this method, the capillary electrophoresis, that was a Kelly Fry case and they found, yes, it was novel then. I think that's a 2008 case. And they found that it was generally accepted. And they found that when you're applying that test to what we have here, the exact situation where it's either multiple donors or degraded DNA, they said, well, that's not a Kelly Fry test. Of course, Kelly Fry isn't ADPA, but that's not even a Kelly Fry test. That's just a question of did it work in the testing in question. And we had very good experts on both sides explaining why or why not. And just finally, on that question of reliability, the main authority that my colleagues relied on for DNA testing, that would be this, it's a 2008 technical note that is quoted in the brief as their main authority. And you can find it on ER 872. I'm pretty sure it's ER 872. The pages got confused in some of the citations when they got made into the ER separate citations. But if you look on ER 872 and read the abstract, that's the bottom line. And that's the page that my colleague is quoting from. Is this the NIST report? No, the NIST report is what they want to bring in on if they make the motion concerning. This was before the district court and is properly before this court. They accurately quote from the beginning of the abstract and the first sentence, but what they leave out is the conclusion of the abstract, which said, our results demonstrate significant performance improvements in models of DNA degradation, PCR inhibition, and non-probitive samples when compared to the prior methods. And we're talking about the mini-filer that was used in this case. The final sentence, these data support that the mini-filer kit will increase the likelihood of obtaining additional STR information from forensic samples in situations in which scattered STR chemistries fail to produce complete profiles. That's exactly what we have here. And we have a 2008 case, years before this trial, years before the testing, saying that actually it's good. On an unrelated note, one quick question about the record. Both the district court and the state appellate court mentioned that Mr. Russell unprompted mentioned J Street when he was being interrogated by the police. Is there anything in the record that sheds light on the significance of that? No. I would like to say that it was obvious that that's, she must have been taken from J Street. No. There is such a street? There is such a street, and it's in that neighborhood. I think that the point that the officers were making was, well, look, we didn't say it. So that's something you came up with. So, but again, as to the third-party culpability, it is important to note that when he was questioned twice and given every opportunity to offer an explanation, said, you know, her DNA is in, your DNA is in her. Can you tell us why? He looks at the photograph twice and says, I've never seen her. I never had sex with her. This is not a third-party culpability case.  Thank you, Your Honor. Counsel, given the standard that we have to apply, what's your best argument for this being in this application of the facts? Your Honor, as to the DNA or the third-party or both, third-party, the connections between Mr. Carrillo and the victim, Ms. Zuniga, were so clear and compelling, and they were admissible, because under California law, for example, the Mr. Carrillo's statements to the police, they're against his penal interest. That hearsay comes in, and it would have been compelling. It was excluded. I mean, that's really more an argument. That's not a reasonable determination of the facts. That's just an assessment of the facts that has a certain legal relevance or not to it. As to what part of the factual record do you think the California Court of Appeal just was incorrect about? In determining that all of it would have been excluded as hearsay, which is part of that, that it just wouldn't have come in, that was an unreasonable determination of the facts that were before the court, because it was admissible evidence. It was admissible under these various sections of the California Penal Code and also under constitutional standards that don't allow state rules to exclude evidence that's a crucial part of the individual's defense. Those cases are cited in my brief. That that was objectively unreasonable. It was ignoring important evidence that was crucial to the outcome and instead focusing only on single things like, oh, they were able to put in this small amount of evidence that he was in the cafe. And I'd like to point out as well that this contention about the gun, the gun was never found. No one ever recovered the gun that fell out of Carrillo's pocket, so how could they know it wasn't the murder weapon? That's just unsupported. The comment about J Street, Mr. Russell was transported quite a ways between where he was taken by the gym and then before his interrogation. Who knows when that J Street information might have come up in a conversation with the other officers who were transporting him. That's so speculative. It could not support the judgment in this case. Also, his comment that he didn't recognize Miss Zuniga. This was 33 years ago. Who would remember whether they saw someone in 1979? I mean, it's just unreasonable to think that that's an admission of guilt on his part. All of these little factors where the government seems to be saying, oh, if we can be assured that he's guilty because of these very small and speculative things, some of which don't even make sense. I'd also like to point out that my colleague was claiming that we are relying only on this one part, small part of the records from 2008 study. That is simply not the case. I cited two cases, Williams and Rochat. One from 2022 where similar evidence, this degraded type of DNA, or very, very small, tiny amounts where courts conducted a full and fair pretrial hearing, which is all we are asking for here, where they allowed evidence on both sides and had a judge make the decision as to whether it was fair to allow a jury to hear this and to put limitations on what these experts would reasonably be able to say. And I would ask the court to review those decisions, particularly Rochat from 2022. Great. Thank you both for the excellent argument. The case has been submitted.
judges: LEE, BRESS, MENDOZA